UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
DANIEL TRIOLO,                                          :      Case No. 18-CV-1100
                                                       :
                       Plaintiff,                      :      **COMPLAINT WITH**
                                                       :      **JURY DEMAND**
           -against-                                   :
                                                       :
FRESENIUS MEDICAL CARE HOLDINGS, INC.                  :
d/b/a FRESENIUS KIDNEY CARE,                            :
                                                       :
                       Defendant.                      :
---------------------------------------------------------------- X

Plaintiff Daniel Triolo, by his attorney, Law Office of Andrea Paparella, PLLC, alleges:

## NATURE OF THE ACTION

1.      This is a civil action for damages and remedies by Triolo against his former

employer, Fresenius Medical Care Holdings, Inc. d/b/a Fresenius Kidney Care ("Fresenius") for

discrimination, harassment, and retaliation under: (a) the New York State Executive Law § 296 et

seq. ("New York State Human Rights Law"); (b) the Administrative Code of the City of New York

§ 8-101 et seq. ("New York City Human Rights Law"); and (c) the New York Labor Law.

2.      Fresenius also failed to pay Triolo and other employees all wages it owed them,

violating the New York Labor Law, and retaliated against Triolo for complaining about its failure

to pay owed wages, again violating the New York Labor Law. Fresenius also retaliated against

Triolo for taking medical leave, and interfered with his right to do so, violating the Family and

Medical Leave Act.

**THE PARTIES**

3.      Plaintiff Daniel Triolo is a white male who was previously employed by Defendant Fresenius.

4.      Triolo worked for Fresenius in New York State, specifically in Queens, in New York City.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over this action under 42 U.S.C. §§ 2000(e) et seq. and 28 U.S.C. §§ 1331, and the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

6.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this judicial district.

**STATEMENT OF FACTS**

7.      Triolo is a white male.

8.      Triolo was employed by Fresenius from 2001-2006, and again from 2009 to February 20, 2017, when Fresenius fired him, after announcing in April 2016 that it was going to try to make its management less white.

9.      Despite being a long-standing exemplary employee, Fresenius fired Triolo shortly after he complained of Fresenius's: race-discrimination; violation of the Americans with Disabilities Act; receipt of unlawful kickbacks; failure to protect public safety and pay employees owed wages; violation of New York City's Earned Sick Time Act; and shortly after he became disabled with an ulcer diagnosis in September 2016 and took a brief accommodation where he worked from home from January 19, 2017 to January 30, 2017, due to a toe infection and biopsy for that toe.

2

10.     Below is a short summary of Triolo's story.

11.     Fresenius took more than one adverse action against Triolo. And it did so because he is a white, slightly disabled man, and because he complained, not only about Fresenius's discrimination, but also about its violation of other laws and its actions that were jeopardizing the safety of its patients and the public.

## 1.     FACTS

### 1.1.    Triolo Was Qualified For His Position At Fresenius, And Excelled.

12.     Triolo is a New York State Licensed Advanced Family Practice Nurse Practitioner, with a Master's Degree in Nursing Administration.

13.     Triolo started his medical career in the U.S. Army, first as a medic, then as a licensed practical nurse ("LPN").

14.     Triolo's first job after leaving the military was in 2001 as an LPN with Fresenius Medical Care in Augusta, Georgia.

15.     Triolo obtained his Associate's Degree in Nursing from the University of South Carolina Aiken in 2004, and then his Bachelor's Degree in Nursing from the same school in 2006.

16.     In September 2006, Triolo left Fresenius to pursue critical care nursing, but he then returned to the company when he moved back home to New York in 2009.

17.     In June 2009, Fresenius offered him, and he accepted, the position of Clinical Manager of the South Queens Dialysis Center.

18.     Triolo remained in this position until Fresenius wrongfully terminated his employment on February 20, 2017.

19.     Of the almost 16 years of dialysis experience he possesses, the majority (almost 13 years) were spent employed by Fresenius.

20.     During his time with Fresenius, Triolo received no corrective actions or warnings—until February 15, 2017, five days before Fresenius fired him. And on February 15, 2017, the corrective action form and performance improvement plan was never officially issued to him, but instead rescinded.

21.     During his tenure, Fresenius routinely ranked him as superior when it did annual reviews, and never rated him less than commendable. The South Queens Dialysis Center, under his leadership, received several Annual Fresenius Awards of Excellence at both the Platinum and Gold levels. For Fiscal Year 2016—the year immediately preceding his firing—his clinic earned a 5-star rating in Medicare's Dialysis Facility Compare Star Program for Quality.

22.     Triolo was also a Leadership Team member of the North HELP Group, formed after Hurricane Sandy through a grant from Mt. Sinai Hospital, administered by the New York State Department of Health. The group collaborated with the Office of Emergency Management to better the end stage renal disease ("ESRD") community.

23.     On June 3, 2015, Triolo completed Fresenius's Mentorship Program, which Fresenius designed for Clinical Managers who were excelling in their positions to be trained to mentor new Clinical Managers. Fresenius chose Triolo over all other Clinical Managers in the Queens / Long Island Region.

24.     In sum, Triolo is well-respected in the dialysis community, and known as someone who has advocates for his patients and his staff.

**1.2.    In Approximately April 2016 Fresenius Announced Its Goal To Change The Demographics Of Its Management To Be Less White.**

25.    In approximately April 2016, Fresenius announced its goal to change the demographics of its management to be less white.

26.    Fresenius then repeatedly favored African Americans over Triolo, a white male, throughout 2016, and then fired Triolo on February 20, 2017.

**1.3.    Fresenius Should Have Fired Joanna Rodgers, An African American Administrative Secretary, Who In 2016 Admitted To Accepting Unlawful Kickbacks And Violating Patient Privacy Laws / HIPAA.**

27.    From when Triolo first started working for Fresenius in New York in 2009, Joanna Rodgers, an administrative secretary, was a problem employee.

28.    Ms. Rodgers had corrective actions in her file from the previous Clinical Manager, for not timely completing payroll, and other disciplinary issues.

29.    Once Triolo began supervising Ms. Rodgers her disciplinary issues continued, and Triolo too issued her corrective actions and gave her documented counseling. Among other things, Ms. Rodgers breached patient confidentiality; failed to communicate with Triolo and other staff, including about important patient safety issues; did not timely complete tasks; and was outright rude and insubordinate—she would hang up on calls and refuse to conference with Triolo, her immediate supervisor.

30.    Rather than go through all of Ms. Rodgers' failings, the best examples of why Fresenius should have fired her happened shortly before Fresenius fired Triolo—when Ms. Rodgers violated the Health Insurance Portability and Accountability Act ("HIPAA") by posting photographs online of patients without their consent receiving dialysis treatment, and admitted to accepting unlawful kickbacks (e.g., presents from Fresenius's vendors to encourage Fresenius to

use their services more often). Fresenius issued Ms. Rodgers more than one "final" warning, and yet she remains employed by Fresenius and Triolo does not.

31. In June 2016, Ms. Rodgers again failed to complete a monthly report, and Triolo opened a disciplinary matter about it. At this time, Fresenius had already issued her a "final" warning. Triolo requested Fresenius fire Ms. Rodgers. Milagros Williams of HR, who is dark skinned, never acknowledged this disciplinary matter.

32. Throughout June 2016 and leading into July 2016, Anne Gaeta, Vice President, Associate General Counsel, Natalie Herron, then Ethics & Compliance Officer, Susan Weber, then interim Director of Operations, Charlene Troncelliti, Director of Human Resources, East Division - North East Group, and Scott Yerger, Northeast Regional Vice President, discussed whether to fire Ms. Rodgers.

33. Ms. Williams protected Ms. Rodgers during this process by excluding Triolo and asking that Triolo send over only Ms. Rodgers' last three annual reviews and the last three months of corrective actions, knowing that Ms. Rodgers' performance issues stemmed much farther back.

34. Ms. Williams also continued to fail to acknowledge the last disciplinary action Triolo opened in June 2016, and then summarily closed it in July 2016 without telling Triolo. Ms. Williams's handling of this June 2016 disciplinary matter breached protocol. Ms. Williams falsified the records concerning this disciplinary action and falsely stated she had extensively interviewed Triolo about the matter. Triolo believes Ms. Williams covered up the existence of this disciplinary matter so that Fresenius would not fire Ms. Rodgers.

35. Fresenius had given Ms. Rodgers such a license to literally break the law that Fresenius still did not fire Ms. Rodgers after she failed until July 2016 to remove the patient

photographs from her FaceBook account, despite Fresenius repeatedly ordering her to do so over three months before.

36.     In July 2016, Triolo complained to Ms. Williams, Ms. Weber and Mr. Yerger that Ms. Rodgers had yet again failed to properly do her work and as a result Fresenius was not in compliance with state law. Triolo also complained that Fresenius should fire Ms. Rodgers.

37.     Ms. Williams, who is dark skinned, told Triolo she had counseled Ms. Rodgers. If this happened it happened without Triolo's knowledge and further undermined Triolo.

38.     Ms. Williams told Triolo that Mr. Yerger had made the final decision to not fire Ms. Rodgers.

39.     This was extraordinary.

40.     Triolo believes it was to coverup the unlawful acceptance of kickbacks and violation of HIPAA.

41.     Triolo emailed Ms. Williams, Mr. Yerger and Susan Weber, Interim Director of Operations, stating: "I feel this entire incident is being buried." No one ever responded.

42.     Ms. Williams and Fresenius were giving Ms. Rodgers the message that she could be insubordinate toward Triolo.

43.     Triolo complained to Ms. Williams that if Fresenius was not going to fire Ms. Rodgers it should transfer her to another location, and that keeping her assigned to Triolo when she knew Triolo wanted her fired was creating a hostile work environment. Instead Fresenius kept Ms. Rodgers in her position and she remained in it even after Fresenius fired Triolo.

**1.4.    Shortly After Ms. Chin Became Employed At Fresenius In September 2016, She Sided With An African American Patient With Such Bad Behavioral Problems That She Was On A Behavior Contract, Over Triolo—A Recognized Longstanding Exemplary Employee.**

44.    In September 2016, Fresenius hired Jenelle Chin to be Director of Operations.

45.    Ms. Chin is African American.

46.    Ms. Chin replaced Ms. Weber, who is white and was more qualified.

47.    Ms. Chin had no prior healthcare experience and was incompetent at her job, and was insecure about it.

48.    When she first started at Fresenius, Ms. Chin abruptly left a staff meeting, without warning, and then came barging back in saying "I am not as young as I look, I am actually much older." Then she just left. The staff present was perplexed and looked at each other. To this day, Triolo has no idea what prompted Ms. Chin's behavior.

49.    Shortly after being hired, Ms. Chin favored an African American patient, with known long-standing severe behavioral issues, over Triolo, a white male.

50.    This patient's behavior issues were extensive. She acted aggressively toward staff, threatening staff with a needle. She unlawfully accessed other patients' files and information on Fresenius's premises. She routinely made race-based comments to Triolo and Nadine Irwin, the social worker at the South Queens Dialysis Center, and the only other white employee in the clinic, other than Triolo. This patient referred to Triolo as "white man" and "white guy." She yelled at the clinic and was disruptive. She even mooned Triolo, in front of staff and patients.

51.    This patient was on a behavioral contract since 2014, due to her bad behavior. When Ms. Irwin and Triolo explained to this patient that they would not tolerate her behavior, she insisted she wanted someone who could "understand what it is like to be a Black Woman in the world."

52.     Ms. Chin was aware of all of this, and did nothing to protect Fresenius staff, but incredibly preferred this patient.

53.     On September 27, 2016, this patient violated a safety rule that patients not come to the treatment floor until called for treatment. In addition to safety, there are patient confidentiality issues. This patient on this specific incident looked at patient information at a nurses' station.

54.     Shortly after this violation, this patient requested to receive treatment during an earlier shift, rather than the fourth shift. As part of this patient's behavioral contract she was to receive treatment on the fourth shift, until she could control her bad behavior. The South Queens Dialysis Center customarily put on the fourth shift problem patients and those on probation.

55.     Ms. Chin, who had no prior healthcare experience before Fresenius, went behind Triolo's back and had a meeting with this patient without inviting Triolo or even discussing it with Triolo, even though assigning patient shifts was a specific role of Triolo.

56.     Such a meeting never should have happened without Triolo and Ms. Irwin, according to established Fresenius protocol. Ms. Chin invited neither of them.

57.     Ms. Chin agreed to move this patient to the earlier shift this patient requested, despite normal protocol and without asking Triolo or Ms. Irwin, thus undermining their authority with this patient who was known to harass Ms. Irwin and Triolo based on their race, and undermining their authority in general, with all patients and staff.

**1.5. Throughout December 2016, And January And February 2017, Triolo Complained About Public Safety Issues, And That Fresenius Was Treating His Clinic Differently.**

58. Throughout December 2016, And January and February 2017, Triolo complained about public safety issues, and that Fresenius was treating his clinic differently—worse, and that Fresenius was not paying its staff owed wages.

59. Among the things Triolo complained of were: (1) Fresenius's hiring freeze had caused dire staffing needs that were posing a public safety danger; (2) there were serious billing issues regarding medications (for example, patients were billed for medications that had no physician orders associated with them in the system); (3) Triolo's clinic still had no emergency generator, and winter had arrived; (4) Triolo's clinic had no elevator, violating the Americans with Disabilities Act; and (5) that effluent (liquid waste and sewage) was leaking throughout the walls of the clinic, putting patient and employee safety and health at risk. In addition to complaining to Ms. Chin and Mr. Yerger and others, Triolo complained to Kirk Hamilton, who managed Fresenius's Biomedical department. Mr. Hamilton was responsible for the lack of an emergency generator, Triolo's clinic having no elevator, no accessible parking, and the effluent leaking through the walls. He was African American like Ms. Chin and was good friends with Ms. Chin. Prior to Ms. Chin's hire, Mr. Hamilton and Triolo had always had a respectful working relationship.

**1.6. From January 19, 2017 To January 30, 2017, Triolo Worked From Home As An Accommodation For A Toe Infection And Biopsy.**

60. From January 19, 2017 to January 30, 2017, Triolo worked from home as an accommodation for a toe infection and biopsy.

61. Triolo notified Ms. Chin and gave her medical documentation.

62.     Ms. Chin knew Triolo could not drive because of his toe infection.

**1.7.    In February 2017, Triolo Complained About Fresenius's Violation Of New York City's Earned Sick Time Act, And Was Berated By Courtney Gordon, The Director of Operations - Metro NY Area, Who Is African American.**

63.     On February 2, 2017, Triolo tried to clarify Fresenius's misunderstanding of New York City's Earned Sick Time Act.

64.     Courtney Gordon, the Director of Operations – Metro NY Area, berated Triolo. Mr. Gordon is African American.

65.     Mr. Gordon insisted—incorrectly—that Fresenius's policy superseded New York City's Earned Sick Time Act.

66.     In addition to Mr. Gordon, Laura Grieman, Senior Employee Relations of HR, Ms. Chin, Loretta Andersen, Clinical Manager for Queens Artificial Kidney Center ("QAKC"), and Mr. Yerger, were all involved in this extended discussion over New York City's Earned Sick Time Act.

67.     Fresenius was violating this law and Triolo was trying to correct it.

68.     Fresenius then fired Triolo eighteen days after Triolo tried to correct Mr. Gordon's misunderstanding.

**1.8.    On February 15, 2017, Ms. Chin Berated Triolo For Complaining Of Patient Safety Issues And Handed Triolo—And Then  Rescinded—A Corrective Action Form And Performance Improvement Plan.**

69.     There was a Clinical Managers Meeting on February 15, 2017.

70.     During the meeting, Triolo spoke to Ms. Chin about whether the ulcer Triolo had been diagnosed as suffering from fell within the purview of the Occupational Safety and Health Act. Months before Triolo took brief intermittent medical leave because of his ulcer. While Triolo

was on medical leave Triolo worked from home, but Fresenius improperly docked this time from the calculation for Triolo becoming tenured.

71.    Ms. Chin scoffed and said summarily no.

72.    Ms. Chin's reaction obstructed Triolo's rights to complain about his injury.

73.    This was not the first time Fresenius mishandled its employees' injuries. For example, in October 2015, Triolo took brief medical leave due to a serious biking accident. Triolo was compelled to cut his medical leave short because Fresenius needed his help regarding the shutdown of one of its clinics by the Department of Health.

74.    After the meeting, Ms. Chin berated Triolo for having recently complained about various Fresenius violations.

75.    She told Triolo he should not have been so vocal, especially in writing.

76.    Ms. Chin told Triolo that Mr. Hamilton was not happy about his safety complaints.

77.    She reprimanded Triolo and ordered Triolo not to complain any more, especially to the Medical Director, Tahir Hafeez.

78.    Ms. Chin told Triolo not to send any email whatsoever to Mr. Hafeez.

79.    Ms. Chin also told Triolo she did not like the tone of Triolo's emails to Ms. Rodgers.

80.    Triolo defended himself to Ms. Chin.

81.    Triolo pointed out that the clinic was still not ADA compliant, and made clear that Triolo would not ignore patients falling and getting hurt.

82.    Triolo pointed out that the clinic still had no functioning generator or any alternative solution for the elevator, putting patients at risk.

83.     And Triolo pointed out that Fresenius's understaffing of the clinic posed a health safety problem.

84.     Ms. Chin then handed Triolo a Corrective Action Form and a Performance Improvement Plan. Neither of these documents were signed. Neither of these documents mentioned Ms. Chin's order that Triolo stop complaining. Neither of these documents mention what Triolo had complained about—safety and violation of applicable law.

85.     On the Corrective Action Form. The "Detailed Description of Situation" states: "There have been many ongoing issues within the clinic due to lack of consistent presence and failure to use his resources effectively." This Correction Action Form had no merit. The phrase "lack of consistent presence" makes no sense because Triolo had been a dedicated presence at the clinic for years before Ms. Chin became employed at Fresenius, and Fresenius selected Triolo to mentor new Clinical Managers. And regarding the accusation that Triolo failed to "use resources effectively," Fresenius had failed to provide adequate resources and left Triolo in dire need of staff, which Triolo had been complaining about.

86.     When Triolo asked Ms. Chin about these documents she began to stammer and say things that were false.

87.     For example, Ms. Chin said Triolo closed the door too much, but she backed off on this unfair allegation when Triolo said camera footage could prove false this allegation.

88.     Triolo also complained to Ms. Chin that Triolo had actually been working over 40 hours per week and Fresenius had not paid him for it.

89.     This Corrective Action Form and Performance Improvement Plan were just a pretext for Fresenius to fire Triolo and coverup its discriminatory and retaliatory reasons for doing so.

90.     During Triolo's approximately 13-year tenure with Fresenius Triolo had never received a Corrective Action Form or Performance Improvement Plan.

### 1.9.  At The February 15, 2016 Meeting, Triolo Complained To Ms. Chin That She Was Discriminating Against Triolo.

91.     At the February 15, 2016 meeting, Triolo complained to Ms. Chin that she was discriminating against Triolo.

92.     Triolo told her that she was targeting Triolo unfairly and that Triolo was going to go to HR.

93.     Triolo questioned her, "Is this because I am male?" She gave Triolo a smug look.

94.     Triolo asked her, "Is it because I am white?"

95.     Triolo believes Ms. Chin was trying to protect Ms. Rodgers, who is also African American, and who had recently admitted to accepting unlawful kickbacks and had violated HIPAA, among having other disciplinary issues. Performance evaluations were just about to go out, and Triolo's of Ms. Rodgers was of course disfavorable—she had accepted an unlawful kickback and violated HIPAA and patient confidentiality. As Triolo mentioned above, incredibly, Ms. Chin criticized Triolo over Triolo's treatment of Ms. Rodgers.

96.     Similarly, Ms. Chin had favored the above described African American patient with notorious behavioral issues, and who addressed Triolo as "White Man" and "White Guy."

97.     Similarly, Ms. Chin did nothing to correct the utter misinterpretation of the New York City Paid Sick Leave Act, by Mr. Gordon, who is also African American.

98.     Meanwhile, Triolo was a long-standing exemplary employee who Fresenius had held up as a role model.

99.     Ms. Chin's animosity toward Triolo he believes was a product of racism.

100.    Ms. Chin did not sign the Corrective Action Form or the Performance Improvement Plan, nor did she ask Triolo to do so. Instead she agreed that Triolo should gather whatever information Triolo had to support his position and that they would meet at the end of the month to discuss it.

101.    As she began to collect the Corrective Action Form and the Performance Improvement Plan, Triolo asked for them so that Triolo would have copies and would know what information to gather. That is why Triolo has them—they were never actually issued to Triolo.

**1.10.    Fresenius Fired Triolo Five Days Later On February 20, 2017.**

102.    Fresenius was so eager to fire Triolo, it did not even follow its own procedure.

103.    On February 20, 2017, the 11 a.m. conference call with the Queens Area Clinical Managers and Ms. Chin and Mr. Yerger was cancelled, just before it was to occur.

104.    At about 11:30 a.m., Ms. Chin and Mr. Yerger arrived at Triolo's office unannounced.

105.    Mr. Yerger walked in and said, "This is not going to work out."

106.    Triolo told him Triolo was in the middle of trying to get the employee evaluations done as well as other First Quarter tasks.

107.    Mr. Yerger responded: "We will take care of that, you can go now."

108.    Mr. Yerger would not let Triolo gather his things. He told Triolo to arrange a time with Ms. Chin's assistant. He told Triolo not to go alone when Triolo returned his laptop and gathered his things.

109.    Mr. Yerger said nothing else to Triolo.

110.    Ms. Chin remained silent the whole time except said "Good luck" as Triolo left.

111.    The Corrective Action Form itself—which as described above was never actually issued—shows that this was a **Documented Counseling**, which is the lowest degree of discipline, and is described on the form itself as "a documented discussion to address the required need for improvement prior to initiating further corrective action."

112.    There are four more severe degrees—

    i.    **Written Warning** - a documented warning to address expectations and need for immediate improvement.

    ii.    **Final Written Warning** - a documented warning to address expectations and need for immediate improvement following previous warning(s) or immediately for more severe misconduct or performance.

    iii.    **Disciplinary Suspension** - unpaid time away from work implemented after consultation with HR.

    iv.    **Termination** - employment ended due to insufficient improvement related to performance or behavior or as a result of misconduct requiring immediate termination.

113.    The Performance Improvement Plan provides a "**Time frame for required improvement** (30, 60 or 90 days from date plan is given)." Triolo's Performance Improvement Plan stated:

> **30 Days – immediate and sustained improvement to be evaluated on a weekly basis**

> **60 Days - Goal all performance issues are eliminated. If not, further corrective action will be taken, up to and including termination.**

16

114.    Before ever actually even issuing this or any other Performance Improvement Plan, waiting 60 days, or even 30 days, as provided on the Performance Improvement Plan, Fresenius summarily terminated Triolo's employment on February 20, 2017, without giving him any reason.

115.    This was extraordinary.

116.    Fresenius issued Ms. Rodgers more than one final warning yet never fired her. Here, Fresenius, at the most, issued Triolo the lowest degree warning (Ms. Chin actually rescinded the warning and never actually issued it), and fired Triolo five days later, violating its own policy and procedure.

117.    As of Triolo's last day of employment, Fresenius had still failed to notify those patients whose confidentiality Ms. Rodgers and Fresenius breached, as Fresenius should have done and as Triolo informed it.

### 1.11.    Fresenius Replaced Triolo With Pauline Daley, A Less Qualified African American.

118.    Fresenius replaced Triolo with Pauline Daley, a less qualified Jamaican African American, like Ms. Chin.

119.    Ms. Daley is less experienced than Triolo.

120.    She has a lesser educational background and lesser credentials.

121.    Prior to this, Ms. Daley had been the Clinical Manager of the St. Albans center.

122.    In 2016, the New York Department of Health had issued her clinic two Condition-Level citations. Condition-level citations are one removed from Immediate-Jeopardy citations, which immediately shut down a clinic. In all Triolo's years at Fresenius, his clinic was never issued condition-level citations.

123.    Fresenius tasked Triolo with working with Ms. Daley to correct her center's conditions, so they complied with New York Department of Health's standards.

124.    Among other things, Ms. Daley had failed to comply with Fresenius's policy regarding a certain involuntary discharge of a patient.

125.    This was not the first time Ms. Daley had substantive performance issues that put patient safety at risk.

126.    Prior to this, Triolo had been tasked with teaching Ms. Daley how to do what Fresenius called "Continuous Quality Improvement." Her supervisors had disapproved of the way she conducted quality meetings.

127.    As far as Triolo knows despite Ms. Daley's performance issues that created liabilities for Fresenius and endangered its patients, Fresenius never issued Ms. Daley any corrective action.

**1.12.    In March 2017, Beverly Walter, Another White Fresenius Program Manager, Contacted Triolo About Hiring Triolo As A RN, As She Was In Desperate Need Of RNs.**

128.    In March 2017, Beverly Walter, a white Fresenius Clinical Manager, contacted Triolo about hiring Triolo as a RN, as she was in desperate need of RNs.

129.    Ms. Walter was the Program Manager of the Acute Clinic at Good Samaritan Hospital, which Fresenius had acquired.

130.    Ms. Walter and Triolo had previously worked together, so she knew Triolo was more than qualified.

131.    When Ms. Walter tried to hire Triolo she found that Mr. Yerger and Ms. Chin had categorized Triolo as ineligible for rehire.

132.   That Fresenius will not even employ Triolo as an RN is incredible and shows its discriminatory and retaliatory motives. Triolo is more than qualified for this position.

133.   Fresenius's policy is that it only classifies those former employees who it fired for egregious wrongdoing as ineligible for rehire.

134.   Recall, Fresenius did not fire Ms. Rodgers who admitted to accepting illegal kickbacks and repeatedly violated HIPAA and breached patient confidentiality, along with other disciplinary issues such as outright insubordination.

### 1.13.   The New York State Unemployment Board Told Triolo That It Determined That Fresenius Had Terminated His Employment Through "No Fault Of Your Own."

135.   The New York State Unemployment Board told Triolo that it determined that Fresenius had terminated his employment "through no fault of your own."

### 1.14.   Fresenius Demoted Ms. Walter, And Issued Her A Meritless Counseling Statement And Performance Improvement Plan.

136.   After firing Triolo, Fresenius continued its goal to make management less white, and demoted Ms. Walter in approximately May 2017.

137.   Around this time, Joanne Sylvestre, who is African American, and Mr. Yerger issued Ms. Walter a meritless counseling statement and performance improvement plan.

138.   Ms. Walter, like Triolo, was told to "keep your mouth shut and follow the chain of command."

139.   Ms. Walter had been a loyal employee of Fresenius for years. She was not a problem employee, like others who were not fired, such as Ms. Rodgers.

140.   Now Ms. Walter' employment with Fresenius has ended.

**1.15. The South Queens Dialysis Center Is Now In A Terrible State, According To Current Employees.**

141. According to current employees, Triolo's clinic is less white but in a terrible state.

142. Staff has expressed their wish that Triolo was still the Clinical Manager.

143. Fresenius, however, continues its discrimination against white employees to the detriment of its patients.

144. By about May 2017, after firing Triolo, Fresenius had hired four new employees all of whom were black and less experienced than Triolo.

145. When Fresenius fired Triolo, there was only one other white employee in his clinic, out of approximately 64 employees.

146. Fresenius doctors agree that his clinic is a danger to patients, due to staffing, as Triolo had been complaining of in the months leading up to Fresenius firing Triolo.

147. Dr. Surrendra Gupta, Group Medical Director, to whom Triolo had complained about safety, recently became irate when he entered the clinic to see that only two licensed personnel were there to care for 32 patients.

148. Doctors at Fresenius are furious at Ms. Chin and Mr. Yerger for failing to adequately staff the South Queens Dialysis Center, as Triolo had been complaining for the months before Fresenius fired him.

149. Doctors have insisted on being copied on all correspondence, contrary to Ms. Chin's discipline of Triolo for copying Dr. Tahir Hafeez when Triolo complained about patient safety.

150. It is not disputable. Triolo was right. Fresenius is understaffing and overworking its nurses to such a degree that it is compromising patient safety.

## FIRST CLAIM

### (Race Discrimination And Hostile Work Environment
### In Violation of 42 U.S.C. § 1981)

151.    Triolo repeats and realleges all of the allegations contained herein, as if separately alleged.

152.    Triolo is white and protected under Section 1981.

153.    Fresenius subjected Triolo to a hostile work environment as detailed above, and Triolo believes this work environment to be hostile as a result of the above conduct.

154.    The behavior described above was not welcome by Triolo, and was motivated by the fact that he is white.

155.    Fresenius took adverse employment action against Triolo, including, but not limited to, firing him.

156.    Fresenius's conduct towards Triolo constitutes an infringement of his right to make and enforce contracts in violation of Section 1981.

157.    Fresenius's discriminatory conduct was taken with malice or reckless indifference to Triolo's rights. Triolo is therefore entitled to punitive damages.

158.    As a result of Fresenius's intentional discriminatory conduct, Triolo has suffered substantial damages in an amount to be determined at trial.

## SECOND CLAIM

### (Race And Disability Discrimination Under
### The New York State Human Rights Law)

159.    Triolo repeats and realleges all of the allegations contained herein, as if separately alleged.

160.    Triolo was an "employee" under the New York State Human Rights Law, § 296.

161.    Fresenius is an "employer" under New York State Human Rights Law, § 296.

162.    By its actions detailed above, Fresenius has unlawfully discriminated against Triolo on the basis of his race, violating the New York State Human Rights Law.

163.    Because of Fresenius's unlawful conduct, Triolo has suffered and continues to suffer substantial damages, including back pay, other employment benefits, and damages for emotional pain and mental anguish in amounts to be determined at trial.

## THIRD CLAIM

### (Unlawful Retaliation Under
### The New York State Human Rights Law)

164.    Triolo repeats and realleges all of the allegations contained herein, as if separately alleged.

165.    Triolo opposed Defendants' unlawful, discriminatory employment practices and engaged in protected activity under the New York State Human Rights Law.

166.    Fresenius retaliated against Triolo for having engaged in protected activity by, among other things, firing him.

167.    Fresenius's actions constitute retaliation against Triolo violative of the New York State Human Rights Law, § 296-7.

168.    As a result of Fresenius's retaliation, Triolo has suffered substantial damages, including but not limited to, loss back-pay, mental distress and lost wages and benefits, in an amount to be determined at trial.

## FOURTH CLAIM

### (Race And Disability Discrimination Under
### The New York City Human Rights Law)

169.    Triolo repeats and realleges all of the allegations contained herein, as if separately alleged.

170.    Triolo is a "person" under the New York City Human Rights Law, § 8-102(1).

171.    Fresenius is an "employer or an employee or agent thereof" under the New York City Human Rights Law, § 8-102(5) and § 8-107(1)(a).

172.    By Fresenius's actions detailed above, it has unlawfully discriminated against Triolo on the basis of his race, violating the New York City Human Rights Law.

173.    As a result of Fresenius's unlawful conduct, Triolo has suffered and continues to suffer substantial damages, including back pay and reinstatement or front pay, other employment benefits, and damages for emotional pain and mental anguish in amounts to be determined at trial.

174.    Fresenius's discriminatory conduct was taken with reckless indifference to Triolo's rights, entitling him to punitive damages under the New York City Human Rights Law.

175.    As a result of its unlawful conduct, Fresenius is also liable for reasonable attorneys' fees and costs.

## FIFTH CLAIM

### (Retaliation Under The New York City Human Rights Law)

176.    Triolo repeats and realleges all of the allegations contained herein, as if separately alleged.

177.    Triolo opposed Fresenius's unlawful, discriminatory employment practices and engaged in protected activity under the New York City Human Rights Law.

178.    Fresenius retaliated against Triolo for having engaged in protected activity by, among other things, firing him.

179.    Fresenius's actions constitute retaliation against Triolo, and violate the New York City Human Rights Law, § 8-107.

180.    Because of Fresenius's retaliation, Triolo has suffered substantial damages, including but not limited to, lost back-pay, mental distress and lost wages and benefits, reasonable attorneys' fees and costs, in amounts to be determined at trial.

181.    Fresenius appears to have taken its retaliatory actions against Triolo with reckless indifference to his rights, entitling him to punitive damages under the New York City Human Rights Law.

## SIXTH CLAIM

### (Retaliation Under The New York Labor Law)

182.    Triolo repeats and realleges all of the allegations contained herein, as if separately alleged.

183.    Fresenius is an "employer" under the New York Labor Law § 740(1)(a).

184.    Triolo is an "employee" under the New York Labor Law § 740(1)(b).

185.    Fresenius violated the New York Labor Law § 740(2)(c) by, among other things, retaliating against Triolo for objecting to, or refusing to participate in an activity or practice that violated a law, which violation creates and presents a substantial and specific danger to the public health or safety.

186.    Fresenius violated the New York Labor Law § 741(2)(b) by, among other things, retaliating against Triolo for objecting to or refusing to participate in any activity or practice that Triolo, in good faith, reasonably believed constitutes improper quality of patient care.

187.    Triolo complained about Fresenius's activity or practice to his supervisors under New York Labor Law § 741(3).

188.    As a result of Fresenius's retaliation, Triolo is entitled to an injunction against Fresenius to restrain continued violation, reinstatement, compensation for lost wages, benefits, and other remuneration.

189.    As a result of its unlawful conduct, Fresenius is also liable for attorneys' fees and costs.


## SEVENTH CLAIM

**(Fresenius's Failure To Pay Owed Wages To Triolo And Retaliation For Him Complaining About That And Fresenius's Failure To Pay Other Employees Owed Wages, Violating The New York Labor Law)**

190.    Triolo repeats and realleges all of the allegations contained herein, as if separately alleged.

191.    Fresenius violated the New York Labor Law by depriving employees owed compensation.

192.    Fresenius failed to pay Triolo and other employees owed wages and Fresenius retaliated against Triolo for complaining. As a result of Fresenius's violations of the New York Labor Law, Triolo has suffered damages by failing to receive his lawful wages. Additionally, Triolo is entitled to statutory damages, liquidated damages, prejudgment interest, and attorney's fees.

193.    By Fresenius's knowing or intentional failure to pay Triolo's and other employees' wages for all of the hours worked, Fresenius has willfully violated the NYLL Art. 19 §§ 650 et seq. and the supporting New York State Department of Labor regulations.

194.    Fresenius's actions in failing to compensate Triolo in accordance with NYLL was not in good faith.

195.    By, among other things, firing him, Fresenius retaliated against Triolo for complaining about Fresenius failing to pay owed wages.

## EIGHTH CLAIM

### (Violation Of The FMLA)

196.    Triolo repeats and realleges all of the allegations contained herein, as if separately alleged.

197.    Triolo was an "employee" of Fresenius within the meaning of 29 U.S.C. §2611(2)(A) at all times relevant to this action.

198.    Fresenius is an "employer" within the meaning of 29 U.S.C. 2611(4)(A) at all times relevant to this action.

199.    Fresenius knew Triolo had a qualifying event under the FMLA.

200.    Fresenius interfered with Triolo's rights under the FMLA and retaliated against him for requesting and taking FMLA leave.

201.    As a proximate result of Fresenius's interference with Triolo's FMLA rights and Fresenius's retaliation against Triolo in violation of the FMLA, Triolo has suffered and continues to suffer significant loss, including back pay damages and other employment benefits.

202.    Fresenius's violation of the FMLA was willful.

203.    As a result of Fresenius's unlawful conduct, it is also liable for liquidated damages, interest, and attorneys' fees and costs.

WHEREFORE, Triolo prays that this Court grant him judgment for:

A.     his actual damages in an amount to be determined at trial for loss of compensation, including an award of back pay and an award of reinstatement or front pay;

B.     damages in an amount to be determined at trial to compensate Triolo for mental anguish, humiliation, embarrassment, and emotional injury;

C.     punitive damages;

D.     liquidated damages;

E.     an order enjoining Fresenius from engaging in the wrongful practices alleged herein;

F.     an award of reasonable attorneys' fees and the costs of this action; and

G.     such other and further relief as this Court may deem just and proper.

Dated:     New York, New York
February 20, 2018


Law Office of Andrea Paparella, PLLC


By:   /s/ Andrea M. Paparella
       Andrea M. Paparella
       150 W. 28th Street, Suite 1603
       New York, New York 10001
       Telephone: (212) 675-2523
       Facsimile: (914) 462-3287
       Email: ap@andreapaparella.com